1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   COLLEEN STUART,            )   Civil No. 10-2385-WQH(WVG)
                                )
12              Plaintiff,      )   REPORT AND RECOMMENDATION
                                )
13   v.                         )   DENYING PLAINTIFF'S MOTION FOR
                                )   SUMMARY JUDGMENT (DOC. # 10)
14   MICHAEL J. ASTRUE,         )
     Commissioner of Social     )   GRANTING DEFENDANT'S
15   Security,                  )   MOTION FOR SUMMARY JUDGMENT
                                )   (DOC. # 11)
16              Defendant.      )
                                )
17   _____)

18

19        On November 18, 2010, Plaintiff Colleen Stuart (hereafter

20   "Plaintiff"), filed a Complaint for Judicial Review and Remedy On

21   Administrative Decision Under The Social Security Act [42 U.S.C.

22   §405(g)].  On January 18, 2011, Defendant Michael J. Astrue

23   (hereafter "Defendant"), filed an Answer and the Administrative

24   Record (hereafter "Tr."), pertaining to this case. On March 28,

25   2011, Plaintiff filed a Motion for Summary Judgment. On April 11,

26   2011, Defendant filed an Opposition to Plaintiff's Motion for

27   Summary Judgment and a Cross-Motion for Summary Judgment.

          The Court, having reviewed Plaintiff's Motion for Summary
28   Judgment, Defendant's Opposition to Plaintiff's Motion for Summary

10cv2385

Judgment, Defendant's Cross-Motion for Summary Judgment and the administrative record filed by Defendant, hereby finds that Plaintiff Is not entitled to the relief requested and therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

I

PROCEDURAL HISTORY

On February 27, 2007, Plaintiff filed applications for Supplemental Security benefits and Disability Insurance Benefits, alleging that she was disabled since February 20, 2006. (Tr. 16, 118-130). Plaintiff alleged that she became unable to work because of herniated discs in her back, shoulder pain, lower back pain, right side neck pain, shoulder and arm pain, right side body pain, numbness in her right foot, and depression. (Tr. 33, 473, 493).

The Commissioner of Social Security denied her application initially and upon reconsideration. (Tr. 63-72). On November 14, 2007, Plaintiff requested a hearing before an Administrative Law Judge (hereafter "ALJ"). (Tr. 76). On June 25, 2009, Plaintiff appeared before Larry B. Parker, the ALJ, at a hearing with counsel. The hearing was continued. (Tr. 24-28).

On August 17, 2009, Plaintiff again appeared and testified before ALJ Parker. (Tr. 31-58). On September 25, 2009, ALJ Parker found that Plaintiff was not disabled. (Tr. 13). On August 20, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 5-8). On September 21, 2010, the Appeals Council again denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner of Social Security. (Tr. 1-4).

10cv2385

## II

## STATEMENT OF FACTS

Plaintiff was born on April 16, 1950. She completed two years of education after high school. (Tr. 32). Plaintiff worked as a medical assistant until 1995, an airline ticket salesperson from January 1998 to January 2000, a timeshare salesperson at various companies from January 2000 to October 2005, and an education consultant from October 2004 to February 2006.[1] (Tr. 33, 185, 193).

In 2001, Plaintiff 'blew out' her knee and hurt her neck when she fell down a set of stairs.[2] (Tr. 39). In 2004, Plaintiff purportedly suffered a lower back injury in a motor vehicle accident. (Tr. 36). In 2009, Plaintiff had knee surgery. (Tr. 52).

Plaintiff claims she became unable to work on February 20, 2006. (Tr.33). Plaintiff used this date as her disability onset date because it is when her California State Disability Insurance (SDI) payments ended. (Tr. 36). Plaintiff alleges degenerative disc

---

[1] The dates of Plaintiff's reported employment in each job varies by report. (See Tr. 172, 193, 212).

[2] In 2003, doctors recommended that Plaintiff have surgery to alleviate the pain in her neck. Plaintiff did not undergo the surgery on her neck because she is "claustrophobic" and did not want to wear a neck brace.(Tr. 40).

10cv2385

disease[3] (hereafter "DDD"), degenerative joint disease[4], back, shoulder, neck, foot, and right leg pain, lumbosacral[5] DDD, radiculopathy[6], and depression, an affective disorder. (Tr. 33).

Plaintiff has seen several psychologists since her divorce in 1986. (Tr. 40). She has also seen numerous psychiatrists. (Tr. 42). Plaintiff claims that she does very little all day; although she occasionally drives her mother to the Commissary, where they shop together using electric carts. (Tr. 46). Plaintiff claims that she does not do any household cleaning but does do some cooking. Plaintiff claims that she no longer has hobbies and is not a

---

[3]  Degenerative Disc Disease ("DDD") is not really a disease but a term used to describe the normal changes in spinal discs as a person ages. It is when spinal discs break down (or degenerate). It can take place throughout the spine, but it most often occurs in the discs in the lower back (lumbar region) and the neck (cervical region). The changes in discs can result in back or neck pain, osteoarthritis, herniated disc, and spinal stenosis (narrowing of the spinal canal). DDD may be caused by age-related changes such as loss of fluid in spinal discs or tiny tears or cracks in the outer layer of the disc. These changes are most likely to occur in smokers, people who do heavy lifting, and obese people. DDD can also be caused by a sudden injury leading to a herniated disc (an abnormal bulge or breaking open of a spinal disc). DDD may result in back or neck pain and where the pain occurs depends on the location of the affected disc. The pain often gets worse with movements such as bending over, reaching up, or twisting. See http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic.

[4]  Degenerative Joint Disease (also called osteoarthritis)is a type of arthritis that is caused by inflammation, breakdown, and eventual loss of the cartilage of the joints. Osteoarthritis is the most common type of arthritis and usually affects the hands, feet, spine, and large weight-bearing joints, such as the hips and knees. See http://www.medterms.com/script/main/art.asp?articlekey=2932.

[5]  "Of or relating to or near the small of the back and the back part of the pelvis between the hips." See http://www.thefreedictionary.com/Lumosacral. No definition was found for "Lubosacral Degenerative Disc Disease." It appears as though Plaintiff is referring to lubosacral merely as the location/one of the locations of Plaintiff's alleged DDD.

[6]  Radiculopathy refers to nerve irritation caused by damage to the disc between the vertebrae. This occurs because of degeneration of the outer ring of the disc or because of traumatic injury, or both. Weakness of the outer ring leads to bulging and herniation. When nerves are irritated in the neck from degenerative disc disease, the condition is referred to as "cervical radiculopathy," which can cause painful burning or tingling sensations in the arms. When nerves are irritated in the low back from degenerative disc disease, the condition is called "lumbar radioculopathy," which often causes "sciatica" pain that shoots down to a lower extremity. See www.medicinenet.com/degenerative_disc/page 2.htm

4

10cv2385

'typist' on the computer. (Tr. 47-48). However, Plaintiff was able to care for sick and aging family members for a period of time. (Tr. 308).

Subsequent to her disability onset date of February 20, 2006, Plaintiff received state disability benefits for one year. From April 7, 2007 to July 19, 2007, she worked approximately 30 hours per week selling timeshares. Plaintiff was fired for losing her temper. (Tr. 33-36). The ALJ found that for purposes of a disability determination, this particular employment was not "substantial gainful activity." Rather, it was "an unsuccessful work attempt." (Tr. 18).

A.  Dr. Thomas Waltz, Orthopedist

On April 8, 2002, Plaintiff first visited Dr. Waltz. She complained of neck and arm pain as the result of a fall. Plaintiff worked in sales at the time and had undergone previous operations on her knees. Plaintiff told Dr. Waltz that the pain had been progressive since her fall.(Tr. 272). Further, Plaintiff complained of lower back pain that had been present since the 1980's.

On physical examination, Dr. Waltz concluded that Plaintiff walked on her heels and toes normally, had a good range of motion in her neck, and her lumbar[1/] scan showed no particular abnormality. Dr. Waltz also discussed with Plaintiff the possibility of surgery for her neck pain, should medication not alleviate it. (Tr. 272-273).

On April 26, 2005, Dr. Linda Falconio, Plaintiff's primary care physician, referred Plaintiff to Dr. Waltz for a consultation. Plaintiff reported to Dr. Thomas Waltz that she had pain between her

---

[1/]   "Lumbar" refers to five lumbar vertebrae situated in the spinal column. The five lumbar vertebrae are represented by symbols L1 through L5. The five vertebrae are situated in the part of the back and sides between the lowest ribs and pelvis. See http://www.thefreedictionary.com/lumbar;http://www.medterms.com/script/main/art.asp?articlekey=18053.

10cv2385

shoulder blades and pain in her lower back that was radiating into her legs. She explained that the pain was aggravated by a car accident in 2004. (Tr. 270).

Dr. Waltz found that Plaintiff appeared to have some degenerative arthritis,[8] intractable[9] pain syndrome, and a recent cervical[10] and lumbar strain. He recommended that she try medication at bedtime and to have a lumbar MRI[11] scan. (Tr. 270-271).

On May 11, 2005, Plaintiff had an MRI of her lumbar spine. The MRI found that Plaintiff's alignment of her lumbar spine was within normal limits with very mild loss of disc height[12] at L4-5 and a mild disc diffuse bulge[13] at this level. Plaintiff also had mild to moderate facet[14] degenerative joint disease at L5-S1.[15] (Tr. 266).

B. <u>Linda Falconio, M.D., Plaintiff's Primary Care Physician</u>

---

[8]   Degenerative arthritis is also known as Degenerative Joint Disease and osteoarthritis.

[9]   "Intractable Pain" refers to pain that is not easily relieved or cured. See http://www.merriam-webster.com/medlineplus/intractable.

[10]   "Cervical" is of or relating to a neck or cervix. See http://www.merriam-webster.com/medlineplus/cervical.

[11]   Magnetic Resonance Imaging (MRI) if a noninvasive diagnostic technique that produces computerized images or internal body tissue. See www.merriam-webster.com/medlineplus/magnetic+resonance+imaging.

[12]   Loss of disc height is a symptom of Degenerative Disc Disease. See http://www.medicinenet.com/degenerative_disc/article.htm.

[13]   A "disc bulge" is also known as a herniated disc. A herniated disc is when the softer central portion of a disc ruptures through the surrounding outer ring, possibly causing pain at the level of the disc herniation. A herniated disc is a symptom of Degenerative Disc Disease. See http://www.medicinenet.com/degenerative_disc/article.htm

[14]   "Facet joints" are joints that stack the vertebrae. See http://www.medicinenet.com/degenerative_disc/article.htm.

[15]   Refers to Lumbar 5, and Sacral 1 discs in the spine. "Sacral" refers to the "sacrum," the triangular bone at the base of the spine. See http://medical-dictionary.thefreedictionary.com/sacrum. Basically, Plaintiff has mild DDD in her lower back.

Plaintiff began to visit Dr. Falconio in December 2004 for primary care after her motor vehicle accident. (Tr. 187).

On June 16, 2005, Plaintiff was extremely stressed over her finances, employment issues, and problems at home with her son. On this date, Dr. Falconio noted that Plaintiff's recent (2004) auto accident exacerbated her chronic[16] back pain and that Plaintiff had continued problems with numbness in her legs, likely due to her spinal cord problems. Dr. Falconio reported that Duragesic patches[17] improved the control of Plaintiff's pain until her recent (at the time) move, when she did a lot of lifting and packing. (TR. 322).

On January 11, 2006, Plaintiff visited Dr. Falconio, complaining of problems at work. Dr. Falconio noted much improvement in Plaintiff's back pain with the use of a Duragesic and occasional use of Norco[18] medication. (Tr. 316).

On March 13, 2006, Dr. Falconio reported that Plaintiff was fired from her job after missing a mandatory meeting due to fatigue from her pain medications. Dr. Falconio reported that Plaintiff was beginning to suffer from muscle ticks, had no appetite, was on numerous pain medications, and her Duragesic patches were wearing off quickly (in less than 72 hours). Further, Dr. Falconio reported that Plaintiff could not sit, walk, or stand for an extended period

---

[16] Chronic refers to long duration, frequent recurrence over a long time and often by slowly progressing seriousness. See http://www.merriam-webster.com/medlineplus/chronic.

[17] Duragesic is a skin patch containing fentanyl, a narcotic (opioid) pain medicine. The Duragesic skin patch is used to treat moderate to severe chronic pain. Duragesic is not for treating mild or occasional pain or pain from surgery. See http://www.drugs.com/search/php?searchterm=Duragesic=patches.

[18] Norco is a prescription medication containing acetaminophen(a less potent pain reliever that increases the effects of hydrocodone) and hydrocodone (a narcotic pain reliever). Norco is used to relieve moderate to severe pain. See http://www.drugs.com/norco/html.

of time, she had foot-drop [19] on her right foot, she had leg pains, and Plaintiff reported that she was not sure what she could do for a job. Dr. Falconio reported that Plaintiff told her that she had applied for unemployment, but was not sure that she would receive it. Dr. Falconio gave Plaintiff a form for disability. (Tr. 311).

On June 23, 2006, Plaintiff visited Dr. Falconio. Plaintiff reported that she had numbness and pain on the bottom of both of her feet, and that she could not stand, or sit for an extended period of time. Plaintiff also reported that she was taking care of her father who had Alzheimer's Disease, and was visiting him at least once every two days. Dr. Falconio noted that Plaintiff had weight loss due to early satiety,[20] that she had chronic pain, financial stress, severe low back pain (LBP), spinal disease, chronic pain syndrome, probable Bilateral Morton's Neuroma[21], and continued stress from caring for her sick parents and troubled son. (Tr. 308).

On September 25, 2006, Plaintiff visited Dr. Falconio. Dr. Falconio reported that Plaintiff was still in a lot of pain and under a "tremendous amount" of stress with her son. Dr. Falconio reported that Plaintiff must extend her disability for six more months. (Tr. 304).

---

[19] Foot-drop is a dropping of the front of the foot due to weakness or paralysis of a anterior muscles of the lower leg. Foot drop results in what is called a steppage gait in which the advancing foot is lifted high in order that the toes may clear the ground. Foot-drop can be caused by a number of conditions, including injury to muscles in the foot, or nerves to these muscles. See http://www.medterms.com/script/main/art.asp?articlekey=22480.

[20] Early satiety is feeling full sooner than normal or after eating less than usual. See http://www.drugs.com/enc/satiety-early.html.

[21] A neuroma is a growth that arises in nerve cells. A Morton's Neuroma is a swollen, inflamed nerve located between the bones at the ball of the foot. http://www.medicinenet.com/mortons_neuroma/article.htm.

10cv2385

On April 23, 2007, Dr. Falconio opined that Plaintiff had chronic anxiety, chronic back pain, sciatica,[22]/ increasing problems with the use of her right leg, and multiple stresses from her finances. Dr. Falconio reported that Plaintiff was waiting to receive long-term disability. Plaintiff was given re-fills on various medications, including Xanax[23]/ and Soma.[24]/ (Tr. 646-648).

On October 2, 2007, Plaintiff's chart noted that Plaintiff "cannot sit, walk, or do much of anything, her life is really bad due to her pain." Furthermore, it was noted that (1) Plaintiff has a discolored buttocks due to tissue injury from the use of heating pads to control pain, (2) she needed an MRI of her spine,(3) she was trying to work but needed a letter regarding a drug test,(4) she still could not feel her foot, since her motor vehicle accident in 2004, (5) she could not go to dinner or the movies, (6) she could not stand or walk for more than 10 minutes, (7) she rarely had upper back problems but her lower back was "really a problem now," (8) her bowel function was impaired due to her spine problems and nerve injury,(9) she had chronic anxiety and panic, (10) she had progressive weight gain from inability to be active, and (11) she had chronic bladder problems due to all the pressure and pain. An order was given for Plaintiff to have a brain MRI and she was given a re-fill on her Xanax. (Tr. 642, 644).

---

[22]/   Sciatica is pain resulting from irritation of the sciatic nerve, typically felt from the low back to behind the thigh and radiating down below the knee. Sciatica can result from a herniated disc or any irritation or inflamation of this nerve. See http://www.medterms.com/script/main/art.asp?articlekey=5418.

[23]/   Xanax is in a group of drugs called benzodiazepines. It affects chemicals in the brain that may become unbalanced and cause anxiety. Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. See http://www.drugs.com/xanax.html.

[24]/   Soma is a muscle relaxer that works by blocking pain sensations between the nerves and the brain. Soma is used together with rest and physical therapy to treat injuries and other painful musculoskeletal conditions. See www.drugs.com/soma/html.

10cv2385

On March 17, 2008, Plaintiff's chart noted that she had been living with her mother in a retirement facility since her father passed away in January 2008. Plaintiff reported that disability "turned her down right away." Dr. Falconio reported that Plaintiff "just can't work due to the pain and drugs. She has no comfortable position to sit. Her legs get numb in the car." Dr. Falconio further reported that Plaintiff had stress with the recent death of her father, had permanent disability and chronic anxiety, and that her pain medications would be increased. (Tr. 635, 637).

On January 20, 2009, Dr. Falconio reported that Plaintiff was limping and using a cane. Plaintiff stated that she would need to have her knee replaced but was not sure when the surgery would take place. Dr. Falconio noted that Plaintiff "is doing ok otherwise." (Tr. 632).

On April 22, 2009, Plaintiff visited Dr. Falconio for pre-knee operation and other concerns. The Patient Chart indicated that Plaintiff was planning on a total knee replacement that week with Dr. Hackley. Plaintiff reported several months of chest pressure radiating to her neck and jaw, and occasional radiation to her arm. The chart indicated that Plaintiff "has severe DDD in neck and spine, nerve damage on her right side, and a bit of drop foot."

Plaintiff blamed her reported foot spasms on being "shoved by a police woman" on April 18, 2009. The chart further indicated that Plaintiff was under stress because she was taking care of her mother. Her mother was in her 80's, and had dementia and night terrors. Additionally, Plaintiff's son was out of jail on bail and was allegedly being harassed by the police. (Tr. 625-626).

Dr. Falconio advised Plaintiff to cancel her surgery. Plaintiff declined pain medications, stating that she just needed to

10cv2385

talk about the incident with her son. Notes in Plaintiff's chart also indicated that Plaintiff's foot spasms may be caused by her disc disease and abnormal gait, but labs tests were ordered in order to rule-out other possible causes. (Tr. 628).

On June 15, 2009, Dr. Falconio completed a "Spinal Residual Functional Capacity Questionnaire" with regard to Plaintiff. Dr. Falconio noted that (1) Plaintiff has chronic pain with tenderness, muscle spasm, lack of coordination, atrophy,[25] and reduced grip strength, but Plaintiff has no significant limitation of motion, (2) Plaintiff has depression, anxiety, and irritability, which affect her physical condition, (3) Plaintiff is incapable of even "low stress" jobs because of her chronic pain, drowsiness, and irritability, (4) Plaintiff can only walk one-half of a city block without rest or severe pain, she can only sit for 15 minutes without getting up, and she can only stand for 20 minutes at one time, (5) in an eight hour work day, Plaintiff can sit and stand or walk for less than two hours, (6) at work, Plaintiff would need to shift positions at will, (7) Plaintiff should carry less than 10 pounds rarely, (8) Plaintiff should rarely move her head, twist, and climb stairs, (9) Plaintiff should never stoop, crouch, or climb ladders, (10) Plaintiff cannot use her right hand at all and can only use her left hand 10 percent of an eight-hour working day, (11) Plaintiff is likely to miss more than four days per month of work. Based on all of her observations, Dr. Falconio opined that Plaintiff is capable of "less than sedentary work." (Tr. 677-682).

---

[25] Atrophy refers to a decrease in size or a wasting away of a body part or tissue. www.nlm.nih.gov/medlineplus/mplusdictionary.html.

On March 17, 2010, Dr. Falconio wrote a letter recommending Plaintiff's use of a service dog due to her chronic pain, spinal disease, severe depression, and situational stress. (Tr. 731).

On June 2, 2010, Dr. Falconio filled out the "Mental Work Restriction Questionnaire" on behalf of Plaintiff. Dr. Falconio reported that Plaintiff had depression, a stress disorder, anxiety, and panic, as found by her psychologist, Dr. Angelina Hood. Dr. Falconio further noted that Plaintiff had mostly "severe" impairments in the area of engaging in various work activities, including tasks such as remembering procedures, maintaining attention for two hours, making simple decisions, accepting instructions, and responding to criticism. Dr. Falconio further reported that Plaintiff had a "poor" prognosis. (Tr. 734-735).

Dr. Falconio also filled out an "Evaluation Form for Mental Disorders" on behalf of Plaintiff. Dr. Falconio noted several illnesses and social history, including incapacitation from working, chronic pain, and anger issues. The doctor reported that Plaintiff had difficulty accomplishing daily tasks, had a lot of disagreements with neighbors, had poor coping abilities with stress, that Plaintiff worked poorly with others, and that she had previously been terminated from jobs. (Tr. 737-740).

C. Angelina Hood, Ph.D., Plaintiff's Psychologist

Plaintiff first visited Dr. Hood in 2001 for depression, therapy and medication. (Tr. 187).

On June 22, 2009, Dr. Hood filled out a "Mental Impairment Questionnaire" about Plaintiff. With regard to employment, Dr. Hood opined that there are several areas where Plaintiff had no useful ability to function, including (1) maintaining attention for two hours, (2) maintaining regular attendance, (3) working in proximity

10cv2385

with others without being distracted, (4) completing a normal workday without psychologically based symptoms and an unreasonable number of rest periods, (5) getting along with co-workers, (6) dealing with normal work day stress, and (7) dealing with stress of semi-skilled and skilled work. (Tr. 691-692).

Furthermore, Dr. Hood opined that Plaintiff possessed numerous symptoms, including (1) physical and emotional limitations, (2) irritation and moodiness with her physical problems, limiting her ability to work with, and interact with others, (3) that Plaintiff's psychiatric condition exacerbated Plaintiff's experience of pain and other physical symptoms, and (4) that Plaintiff has anxiety, depression, elation, irritability, anger, frustration, and sadness.

Dr. Hood opined that Plaintiff has chronic pain, is depressed, and has a pain disorder. Dr. Hood further opined that Plaintiff's problem areas include occupational, economic, and social environmental issues. (Tr. 689-698).

D.  Michael Sebahar[26], M.D., Plaintiff's Pain Management Physician

Plaintiff began visiting Dr. Sebahar on May 10, 2005, for pain management, medications, examinations, and testing. (Tr. 187, 262, 468). Plaintiff complained of pain in her lower back, neck, and upper mid-back region. She described "stabbing pain," radiating down her calf, with numbness in her right foot, and "stabbing" pain radiating down her arm to her elbow and right breast. Plaintiff told Dr. Sebahar that her neck pain began a few days after a fall in 2001, when she also injured her left knee. Plaintiff claimed that her pain worsened after her motor vehicle accident on December 4,

---

[26]   Plaintiff and Defendant consistently and mistakenly refer to Dr. Michael Sebahar as Michael "Sebahak." The correct spelling is "Sebahar."

10cv2385

2004 and that the pain fluctuated in intensity between her back and her neck. Further, Plaintiff reported numbness in her right toes and the dorsum[27/] of her foot. (Tr. 468).

Dr. Sebahar noted that anti-depressants increased Plaintiff's pain and that she received only slight relief from muscle relaxants, opioids, heat, and ice. Dr. Sebahar started Plaintiff on extended release Fentanyl Patches[28/] and noted that she was adverse to lumbar epidural steriod injections[29/] and to cervical epidural steroid injections. Dr. Sebahar assessed Plaintiff with having (1) Lumbar/Sacral[30/] Radiculopathy, (2) Cervical Radioculopathy, (3) DDD, lumbar, (4) DDD, cervical, (5) Spondylosis,[31/] lumbarsacral and (6) Spondylosis, cervical. (Tr. 466, 468).

On June 8, 2005, Plaintiff visited Dr. Sebahar. Dr. Sebahar reported that Plaintiff was "very pleased" with the results of the fentanyl pain patch, and noted that Plaintiff also used Norco daily,

---

[27/]  Dorsum refers to the upper surface of an appendage or part. See http://www.merriam-webster.com/medlineplus/dorsum.

[28/]  Fentanyl is a narcotic (opioid) pain medication. The Fentanyl Patch should be used only for long-term or chronic pain requiring continuous around-the-clock narcotic pain relief that is not helped by other less powerful pain medicines or less frequent dosing. See http://www.drugs.com/cdi/fentanyl-patch.html.

[29/]  Epidural steroid injections (ESI) are minimally invasive procedures used to treat pain in the neck, arms, back, and legs caused by inflamed nerves. Injections in the lumbar (low back) region are low risk while injections in the thoracic (mid back) and cervical (neck) region have risk of injury to the spinal cord. See http://www.drugs.com/clinical_trials/study-shows-no-(continued) standardized-approach-epidural-steroid-injections-back-pain-6666.html.

[30/]  Refers to the sacrum which is the large bone at the base of the spine. It is located in the vertebral column, between the lumbar vertebra (upper) and the coccyx (lower). See http://www.medterms.com/script/main/art.asp?articlekey=7936.

[31/]  Spondylosis is the degeneration of the disc spaces between the vertebrae. The finding of this in the spine is commonly associated with osteoarthritis (degenerative joint disease). See http://www.medterms.com/script/main/art.asp?articlekey=13959.

10cv2385

along with some use of Soma. Dr. Sebahar increased the dosage of Plaintiff's fentanyl patch. (Tr. 464-465).

On July 6, 2005, Plaintiff visited Dr. Sebahar. Plaintiff reported a new occurrence of "right drop foot," which she allegedly noticed that day. Dr. Sebahar reported that Plaintiff had not received her epidural steroid injections due to her high deductible. Furthermore, Dr. Sebahar noted that Plaintiff was currently litigating a motor vehicle accident that allegedly had caused her lower back problems. (Tr. 460).

On October 6, 2005, Plaintiff reported that her son had beat her up, increasing her pain. Dr. Sebahar urged Plaintiff to consider attending Alanon or CoDependents Anonymous. Plaintiff was to continue her current medications. (Tr. 445-446).

On December 1, 2005, Plaintiff told Dr. Sebahar that she gotten a restraining order against her son. (Tr. 439-440).

On December 29, 2005, Plaintiff visited Dr. Sebahar. She reported that her pain greatly intensified due to more activity when she moved. Plaintiff reported numbness and tingling in both feet and both radiating and non-radiating pain in her back. Furthermore, Plaintiff stated that she could not stand for long periods of time. Plaintiff reported that she bought an inversion machine[32] which helped to relieve her pain. (Tr. 432, 438).

On January 26, 2006, Plaintiff visited Dr. Sebahar. Plaintiff was given samples of Lyrica[33] in an attempt to help with the

---

[32] Inversion therapy is a method of treating back pain by diminishing the influence of gravity, reducing compression of the vertebrae and discs and allowing the muscles and ligaments that encase the spine to relax. An inversion table allows the user to lie on his or her back in an inverted position so as to eliminate some or all gravitational compression, depending on how far back one's body is positioned. See http:///www.losethebackpain.com/inversionep950.html.

[33] Lyrica is an anti-epileptic drug, also called an anti-convulsant. It works by slowing down impulses in the brain that cause seizures. Lyrica also affects chemicals in the brain that send pain signals

10cv2385

neuropathic[34] pain in her feet. Plaintiff's fentanyl was continued and she was "doing well in this regard." (Tr. 427, 395).

On February 22, 2006, Plaintiff reported that she was under a lot of stress at work because they were not accommodating her medical condition. Plaintiff decided that she wanted to proceed with steroid injections for her pain. (Tr. 397, 402).

On March 22, 2006, Plaintiff reported that she had lost her job and was under a lot of stress. Plaintiff reported no changes in her symptoms and she was stable on her current medication regimen. (Tr. 403, 408).

On April 19, 2006, Plaintiff's chart noted numbness in Plaintiff's right toes and dorsum of her foot, and intermittent weakness in Plaintiff's right leg. Dr. Sebahar further reported that Plaintiff's primary care physician, Dr. Linda Falconio, was placing Plaintiff on disability, and that Plaintiff was stable on her current medications. (Tr. 409, 413).

On May 17, 2006, Dr. Sebahar noted that Plaintiff had begun to change her fentanyl patches before 72 hours had elapsed in order to prevent withdrawal symptoms. (Tr. 414, 418).

On July 13, 2006, Dr. Sebahar reported that (1) Plaintiff had tingling in her feet, especially while she was sitting, (2) that her pain had increased due to an attack by her son, (3) that her fentanyl patch was working, but her lower back pain was still worsening, (4) that Plaintiff was taking three to four Norco per day as her pain increased, and (5) that Plaintiff's previous injections

---

across the nervous system.  See http://www.drugs.com/lyrica.html.

[34]/   Neuropathic pain is chronic pain resulting from injury to the nervous system. It can be related to the central nervous system (the brain and spinal cord) or the peripheral nervous system (nerves outside of the brain and spinal cord). Symptoms of neuropathic pain include shooting and burning pain, and tingling and numbness. See http://www.medicinenet.com/neuropathic_pain/article.htm.

did not provide any relief. Plaintiff was to continue her medications with a slight increase in Norco to combat the increase in pain. (Tr. 419).

On September 8, 2006, Plaintiff reported that she had been under a lot of stress at home and that her pain had increased so that she was taking about four Norco per day. Plaintiff reported that her back pain was greatly increased. (Tr. 361). On October 6, 2006, and November 2, 2006, Plaintiff visited Dr. Sebahar with no major changes. (Tr. 366, 370, 371, 375).

On December 4, 2006, Plaintiff reported that she had still not had an MRI and that she had noticed more back pain and stiffness at night. (Tr. 376, 380).

On January 3, 2007, Plaintiff reported that she has been sick and less active, thus improving her back pain. Plaintiff's medications were continued. (Tr. 385). On January 31, 2007, February 28, 2007, and March 26, 2007, Plaintiff visited Dr. Sebahar with no major changes. (Tr. 353,358,390).

On April 23, 2007, Plaintiff reported that her pain increased more in April, along with an increase of numbness in her right leg. (Tr. 350).

On June 17, 2009, Dr. Sebahar completed a "Spinal Residual Functional Capacity Questionnaire." Dr. Sebahar's Questionnaire is consistent with the findings of Plaintiff's functional and exertional abilities as detailed in Dr. Falconio's Questionnaire. Based on his observations, Dr. Sebahar opined that Plaintiff is limited to "less than Sedentary Work." (Tr. 683-688).

    E. <u>A.W. Lizarraras, State Agency Medical Consultant</u>

On May 15, 2007, Dr. Lizarraras conducted a "Physical Residual Functional Capacity Assessment" with regard to Plaintiff. The

10cv2385

examination concluded that Plaintiff had some exertional and postural limitations. The examination concluded that Plaintiff is able to (1) frequently lift and carry 10 pounds, (2) stand or walk 2 hours of an 8 hour workday, (3) sit about six hours of an 8 hour workday, (4) perform unlimited pushing/pulling, (5) occasionally; climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. (Tr. 470-471).

Furthermore, it was found that Plaintiff is limited by physical problems but does not need reminders, she is able to cook and do some chores, she is able to drive, shop, handle money, pay bills, read for enjoyment, sightsee, dine out, walk at the beach, and she is not in need of a companion. Plaintiff can walk 15-20 minutes without rest. (Tr. 473-474). Significant objective findings include MRI scans from June, 2003, and June, 2005, and various medical appointments and diagnoses. (Tr. 474).

Ultimately, Dr. Lizarraras concluded that Plaintiff's allegations are *partially credible* for back and neck pain, and for Plaintiff's limitations as to prolonged standing and sitting. Dr. Lizarraras reported that Plaintiff appeared to be capable of sedentary work. (Tr. 469-474).

On May 17, 2007, Dr. Lizarraras created a "Psychiatric Review Technique" with regard to Plaintiff. The report covered approximately the time period from Plaintiff's reported disability from February 20, 2006 to May 17, 2007. It was found that Plaintiff's allegations of depression were only *partially credible*, based on subjective and objective evidence. Furthermore, Plaintiff did not appear to have a severe impairment. (Tr. 475- 485).

F. Coastal Pain and Spinal Diagnostic

Unless otherwise stated, all of Plaintiff's visits to Coastal Pain and Spinal Diagnostic (hereafter "CPSD") were with Kelly Geurink, Physician's Assistant (hereafter "PA").

On May 17, 2007, Plaintiff visited CPSD. At this time, Plaintiff was currently taking fentanyl and Norco for her pain. Plaintiff reported that on May 7, 2007, she was "riding a shuttle that was driving out of control and caused [her] to be jolted," increasing her original back pain and causing mid-back pain. The PA re-filled Plaintiff's medication and she was referred to Dr. Waltz in Tahoe, where Plaintiff was residing at the time of this appointment. (Tr. 519-522).

On June 7, 2007, Plaintiff visited CPSD where she reported that she had residual numbness in her right foot and increased back, neck, and arm pain. Plaintiff was referred to a neurologist and informed that epidural injections may benefit her, but Plaintiff preferred to wait on the injections until she saw Dr. Waltz. (Tr. 524-526).

On July 12, 2007, Plaintiff visited CPSD where she reported residual numbness in her right foot and increased back and muscle spasms. The PA noted that Plaintiff was stable on her medication regimen but was using a heating pad regularly to manage her pain. (Tr. 527-529).

On August 9, 2007, Plaintiff visited CPSD where she reported residual numbness in her right foot. However, she reported that her muscle spasms had improved since moving back from Tahoe. (Tr. 530-532).

On September 6, 2007, Plaintiff visited CPDS where she reported difficulty sitting for prolonged periods and that her pain medications were not helping to manage her chronic pain. Plaintiff

10cv2385

reported more stiffness and back pain in the mornings. The PA re-filled Plaintiff's prescriptions. (Tr. 533-535).

On October 4, 2007, Plaintiff reported that she was still having difficulty sitting for prolonged periods and that her pain had continued to increase greatly. She also reported more numbness and tingling in her right foot, and severe back pain. Plaintiff reported that her quality of life decreased due to her pain, that the Norco was helping less for breakthrough pain[35], and that the pain was constant. (Tr. 537). The PA decreased Plaintiff's Norco, continued her fentanyl, and started her on a limited number of Percocet[36] in an attempt to better control Plaintiff's pain. (Tr. 537-539).

On October 31, 2007, Plaintiff reported more parethesia[37] in her lower legs and more neck pain and numbness in three fingers of her right hand. Plaintiff reported that she was using her heating pad consistently and that her primary care physician, Dr. Falconio, was planning to order an MRI. The PA increased Plaintiff's Percocet, continued her fentanyl, and stopped the Norco since Plaintiff was on Norco for a long time, and had developed a tolerance to it. (Tr. 540- 542).

---

[35]/   Breakthrough pain is a transient increase in pain intensity that occurs in patients with stable, baseline persistent pain. See http://www.medical-

(continued)
dictionary.thefreedictionary.com/breakthrough+pain.

[36]/   Percocet contains a combination of oxycodone (narcotic pain reliever) and acetaminophen (a less potent pain reliever that increases the effects of oxycodone). Percocet is used to relieve moderate to severe pain. See http://www.drugs.com/percocet.html.

[37]/   Paresthesia is an abnormal sensation of the skin, such as numbness, tingling, prickling, burning, or creeping on the skin that has no objective cause. www.medterms.com/script/main/art/asp?articlekey=4780.

10cv2385

On November 28, 2007, Plaintiff reported that she was still having difficulty sitting for prolonged periods of time, and that her pain had continued to increase greatly. Plaintiff reported that Lyrica was helping with the numbness in her right hand but that the quality of her life was affected due to her pain. The PA continued Plaintiff's Percocet and fentanyl, and gave her Lyrica samples to continue since Plaintiff had noted improvement in her neuropathic pain. (Tr. 543-545).

On December 26, 2007, Plaintiff reported that she had noticed more pain, including radicular pain[38] in both legs. She reported that the Lyrica helped with her neuropathic pain but had too many side effects, such as severe pain in her hands and difficulty with motor skills. Plaintiff reported that her pain level was increasing. The PA continued Plaintiff's Percocet and fentanyl, discontinued the Lyrica, and started Plaintiff on Duragesic patches to avoid escalating her oral medications. (Tr. 546-548).

On January 3, 2008, Plaintiff called CPSD reporting that her joints were sore and her hands were very "puffy" with finger numbness and tingling. (Tr. 549).

On January 21, 2008, Plaintiff reported that both of her legs were going numb intermittently and that she was using her heating pad daily. The PA continued Plaintiff's Duragesic patch and started Plaintiff on oxycodone[39]. (Tr. 550-552).

On February 14, 2008, Plaintiff reported that she still has difficulty sitting for prolonged periods but she is able to continue her daily activities on her current dose of medications. Plaintiff

---

[38]/   Radicular pain is the manifestation of pressure of damage to nerve roots. See http://www.spinaldisorders.com/radicular-pain.htm

[39]/   Oxycodone is a narcotic pain reliever similar to morphine. It is used to treat moderate to severe pain. See http://www.drugs.com/oxycodone.html.

10cv2385

reported that she moved again and her pain level remained stable. The PA continued Plaintiff's oxycodone, fentanyl, and Duragesic patch. (Tr. 553-554).

On March 13, 2008, Plaintiff reported that her current medication regimen was managing her pain and that she was able to continue her daily activities. However, Plaintiff stated that her lower back pain had increased more. (Tr. 556-557).

On March 26, 2008, Dr. Falconio requested that Plaintiff have an MRI. Plaintiff's MRI revealed minimal disc degeneration and no spinal stenosis[40]/ or neural compression[41]/, concluding that the MRI was an otherwise ordinary lumbar spine MRI. (Tr. 620).

On April 9, 2008, Plaintiff reported that her right foot was going numb more often. (Tr. 559-560).

On April 29, 2008, Plaintiff reported that she had a severe increase in pain in her mid back, with more pain on the right side. Plaintiff reported that she discovered this pain while bending over to put on socks. Plaintiff reported that she could barely stand up, still had numbness in her right foot, and had been using more oxycodone. The PA noted that Plaintiff did have a spasm on her right thoracic[42]/ muscles, and most likely had a muscle sprain or strain. She gave Plaintiff some MSIR (morphine)[43]/ to use in addition to the

---

[40]/   Lumbar Spinal Stenosis (Spinal Stenosis)is a condition whereby either the spinal canal (central stenosis) or vertebral foramen (foraminal stenosis) becomes narrowed. If the narrowing is substantial, it causes compression of the nerves, which causes the painful symptoms of spinal stenosis. See http://www.medicinenet.com/lumbar_stenosis/article.htm.

[41]/   Compression relating to the nervous system. See http://medical-dictionary.thefreedictionary.com/neural.

[42]/   Refers to the chest area. The thorax runs between the abdomen and neck is encased in the ribs. See http://medical-dictionary.thefreedictionary.com/thoracic.

[43]/   Morphine is in a group of drugs called narcotic pain relievers. Morphine is used to treat moderate to severe pain. See http://www.drugs.com/mtm/msir.html.

10cv2385

oxycodone, and a Toradol injection,[44]/ for Plaintiff's pain. (Tr. 562- 564).

On May 7, 2008, Plaintiff went to CPSD for medication refills and reported that her severe back pain had nearly resolved, but that she still had constant low back pain with occasional numbness in her right leg and foot. Plaintiff reported that her activity level had increased, leading to more pain. The PA discontinued the MSIR, increased the oxycodone, and continued the fentanyl and Duragesic. (Tr.566-568).

On June 3, 2008, Plaintiff went to CPSD for medication refills. She reported that she was feeling better and that her current regimen was working well to keep her pain controlled. However, Plaintiff reported more pain in the right ball of her foot. (Tr. 569-571).

On July 1, 2008, Plaintiff reported that she "threw out her back" again, and that she was having spasms along her lumbar spine, with increased pain. Plaintiff reported that her pain was slowly resolving and she believed that her increased spasms were from pushing her mother in a wheelchair. Plaintiff reported minimal relief with Zanaflex[45]/ (prescribed by Dr. Falconio). The PA refilled Plaintiff's prescriptions and started her on Valium[46]/ for use with

---

[44]/   Toradol is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body. It is used short-term to treat moderate to severe pain. See http://www.drugs.com/toradol.html.

[45]/   Zanaflex is a short-acting muscle relaxer. It works by blocking nerve impulses (pain sensations) that are sent to the brain. Zanaflex is used to treat spasticity by temporarily relaxing muscle tone. See http://www.drugs.com/zanaflex.html.

[46]/   Valium belongs to a group of drugs called benzodiazepines. It affects chemicals in the brain that may become unbalanced and cause anxiety. Valium is used to treat anxiety disorders, alcohol withdrawal symptoms, or muscle spasms. See http://drugs.com/valium.html.

10cv2385

her spasms and anxiety. Plaintiff was to discontinue Zanaflex and Xanax. (Tr. 572-574).

On July 24, 3008, Plaintiff reported that her back pain was stable but that she was still using her heating pad consistently on her low back for pain control. Plaintiff reported that the Valium "worked great" for spasms and anxiety. The PA refilled Plaintiff's prescriptions but stopped her Valium, reporting that the Plaintiff could not be on Valium and Xanax and that she was still receiving Xanax from her primary care physician. (Tr. 576-578).

On August 20, 2008, Plaintiff reported that her back pain was "flaring" due to a dog jumping on her. The PA re-filled Plaintiff's prescriptions and "took over" Plaintiff's prescriptions for Zanaflex and Xanax, which were originally prescribed through Linda Falconio. (Tr. 580-582).

On September 17, 2008, Plaintiff reported that her pain level was higher and that she had another "severe flare up of back pain." Plaintiff also reported pain in her left knee. The PA re-filled Plaintiff's Zanaflex, oxycodone, Xanax, fentanyl, and Duragesic patch. (Tr. 584-586).

On October 13, 2008, Plaintiff reported that her pain level increased. On October 5, Plaintiff reported that she slipped on a wet floor, heard a "pop," and twisted her knee. She also reported flaring back pain. The PA re-filled Plaintiff's prescriptions and referred her to Dr. Hackley, an orthopedist with Torrey Pines Orthopedic Group, for Plaintiff's knee pain. (Tr. 587-590).

On November 5, 2008, Plaintiff reported that her back pain was still severe and that she "throws out her back" more often. Plaintiff further reported that she had significant knee pain and was seeing an orthopedic doctor for treatment. (Tr. 591-593).

10cv2385

On December 1, 2008, Plaintiff reported that she was moving and that her back pain was "flaring greatly" due to lifting boxes. (Tr. 594-596).

On January 20, 2009, Plaintiff visited CPSD, reporting a meniscal tear[47] in her left knee and stating that she was planning to have knee surgery in the near future. (Tr. 601-603). On February 13, 2009, and March 9, 2009, Plaintiff had follow-up appointments. (Tr. 604-609).

On April 1, 2009, Plaintiff reported an increase in her back pain and spasms. She reported that her right leg continued to have severe paresthesia and that she still had a meniscal tear in her left knee, and planned to have surgery. Plaintiff also reported poor sleep at night due to the pain, along with difficulty walking, standing, and sitting for prolonged periods of time. The PA re-filled Plaintiff's prescriptions and increased her Xanax to help with the spasms and anxiety. (Tr. 610- 612).

On April 22, 2009, Plaintiff reported a "spike in pain" due to an incident with police. Plaintiff claims she was "shoved," causing her low back and right leg pain to flare, and causing more pain along the entire right side of her body. Plaintiff also reported an upcoming knee surgery. The PA re-filled Plaintiff's prescriptions and gave her MSIR for post-operation pain for after Plaintiff's knee surgery. (Tr. 614-616).

On May 19, 2009, Plaintiff reported that she had undergone knee surgery, improving her knee pain greatly. However, Plaintiff reported the same back pain complaints and right foot parathesia.

---

[47] A torn meniscus is damage to the cartilage within the knee. A torn meniscus occurs because of trauma caused by forceful twisting or hyper-flexing of the knee joint. Symptoms of a torn meniscus include pain, swelling, popping, and giving way of the knee. See http://www.medicinenet.com/torn_meniscus/article.htm.

10cv2385

Plaintiff also reported that her neck pain improved since her last visit. The PA re-filled Plaintiff's prescriptions and discontinued the MSIR (Tr. 617-619).

G.  Torrey Pines Orthopedic Medical Group

On October 23, 2008, Plaintiff visited Dr. David Hackley at Torrey Pines Orthopedic Medical Group (hereafter "TPOMG"), pursuant to a referral from Dr. Sebahar. Plaintiff complained of soreness in her knee after an alleged fall on her washroom floor. Dr. Hackley conducted x-rays and found a left knee strain, but no meniscus tear. Plaintiff requested an MRI scan. (Tr. 711-712).

On November 25, 2008, Plaintiff had an MRI scan. The results conveyed a suspicion of a meniscus tear. (Tr. 671, 721-722).

On January 5, 2009, Plaintiff visited Dr. Hackley at TPOMG for a physical examination. The doctor reported that Plaintiff was to proceed with a left knee surgery. (Tr. 665- 667, 710, 725-726).

On April 22, 2009, Plaintiff visited Dr. Thunder at TPOMG complaining of neck pain, mid-shoulder pain, and some low back pain (LBP), the symptoms of which were exacerbated by an altercation with police. Dr. Thunder took x-rays and found a lumbar, thoracic, and cervical strain, recommending rest and activity modification. (Tr. 664, 709).

On April 30, 2009, Dr. Hackley performed a left knee surgery on Plaintiff. (Tr. 662-663, 723-724). On May 6, 2009, Plaintiff had her one-week post-knee operation appointment at TPOMG. Dr. Hackley reported that Plaintiff was healing nicely and had minimal swelling. (Tr. 661, 708).

On June 10, 2009, Plaintiff visited Dr. Thunder at TPOMG. Plaintiff reported an injury to her low back from leaning forward, and numbness and tingling in her feet. An x-ray showed normal alignment of the lumbar spine and minimal degenerative changes. The

10cv2385

chart indicated that Plaintiff had a low back strain. The doctor acknowledged that Plaintiff was on several pain medications and gave her a prescription for Toradol for acute back strain. (Tr. 659, 706, 713).

Also on June 10, 2009, Plaintiff had a post-knee operation appointment at TPOMG with Dr. Hackley. A physical examination revealed that Plaintiff had an excellent range of motion of her left knee, that she had no effusion[48]/, and she had no significant joint line tenderness. (Tr. 660, 707).

On August 4, 2009, Plaintiff had a follow-up appointment with Dr. Hackley about her left knee. Plaintiff reported that her knee was doing fine but that she recently moved homes and was having symptoms in her back. Dr. Hackley reported that he would not recommend any more physical therapy for Plaintiff's left knee, but that he would see her for her back pain. (Tr. 705).

H. Dr. George W. Weilepp[49]/, Medical Expert

On August 17, 2009, at the hearing held before the Administrative Law Judge, Dr. Weilepp testified as a medical expert to assess the medical evidence of Plaintiff's record. (Tr. 29, 48). Dr. Weilepp opined that Plaintiff has a combination of impairments that is "severe" when all of her impairments are taken together. He reasoned that Plaintiff has a pain issue and that is why she has stopped working. He also indicated that Plaintiff has had knee problems. (Tr. 52-53).

Dr. Weilepp opined that the duration of an eight hour day is a problem for patients who manage their pain with a lot of chemicals.

---

[48]/   Effusion is the accumulation or escape of fluid in various spaces of the body, including the knee. See http://medical-dictionary.thefreedictionary.com/effusion.

[49]/   In the transcript of Plaintiff's hearing before the Administrative Law Judge, Dr. Weilepp is incorrectly referred to as "Dr. Wyla."

However, Plaintiff did not have any major complications with the chemicals or her prior surgeries. (Tr. 53-54). Dr. Weilepp determined that whether Plaintiff can sustain an eight-hour work day is difficult to ascertain by only looking at medical records. (Tr. 54)

From looking at the records, Dr. Weilepp concluded that he would allow Plaintiff to perform sedentary activity. Furthermore, he stated that Plaintiff was able to drive, and probably did not need to be re-trained.

Dr. Weilepp reasoned that "continuous activity" in the upper extremities is a problem with pain patients like Plaintiff, but "frequent activity" is usually agreeable. He did not know why Plaintiff's prognosis from three of her main treating physicians was "fair to poor" and "poor," and did not know whether Plaintiff could work full time. (Tr. 54).

I. Mr. Kilcher, Vocational Expert

At the hearing before the Administrative Law Judge, Mr. Kilcher, a vocational expert, discussed Plaintiff's prior employment classifications: (1) Plaintiff was a telemarketer, classified at the sedentary level and semi-skilled Specific Vocational Preparation (hereafter "SVP") of (3),(2) Plaintiff was a women's clothing salesperson, classified at the light level and semi-skilled (SVP of 3), (3) Plaintiff was a jewelry salesperson, classified at the light level and skilled (SVP of 5), (4) Plaintiff worked in airline sales, classified at the sedentary level and semi-skilled (SVP of 4), (5) Plaintiff was a timeshare salesperson, classified at the light level and skilled (SVP of 5), and (6) Plaintiff worked as an educational consultant, classified at the sedentary level and skilled (SVP of 8).

10cv2385

III

SUMMARY OF APPLICABLE LAW

Title II of the Social Security Act (hereafter "Act"), as amended, provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from physical or mental disability. [42 U.S.C. § 423(a)(1)(D)]. Title XVI of the Act provides for the payment of disability benefits to indigent persons under the Supplemental Security Income (SSI) program. [§ 1382(a)]. Both titles for the Act define "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months..." Id. The Act further provides that an individual:

> Shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate rea in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. Id.

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled. [20 C.F.R. §§ 404.1520, 416.920. Step one determines whether the claimant is engaged in "substantial gainful activity." If he is, disability benefits are denied. [20 C.F.R. §§ 404.1520(b), 416.920(b)]. If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. That determination is governed by the "severity

10cv2385

regulation" at issue in this case. The severity regulation provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. [§§ 404.1520(c), 416.920(c)].

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." [20 C.F.R. §§ 404.1521(b), 416.921(b)]. Such abilities and aptitudes include "[p]hysica functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting." Id.

If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. [20 C.F.R. §§ 404.1520(d), 416.920(d)]. If the impairment meets of equals one of the listed impairments, the claimant is conclusively presumed to be disabled.

If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from preforming work he has performed in the past. If the claimant is

10cv2385

able to perform his previous work, he is not disabled. [20 C.F.R. §§ 404.1520(e), 416.920(e)]. If the claimant cannot perform his previous work, the fifth and final step of the process determines whether he is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work. [20 C.F.R. §§ 404.1520(f), 416.920(f)].

IV

ALJ'S FINDINGS

The ALJ made the following pertinent findings:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2010.

2. [Plaintiff] has not engaged in substantial gainful activity since February 20, 2006, the alleged onset date.

After the alleged onset date, the [Plaintiff] worked at Club Sunterra from May 4, 2007, to July 19, 2007, on a schedule of 30 hours per week. She stopped due to her medical condition. She was compensated based on a commission basis. Her length of work fell short of substantial gainful activity and that work was considered an unsuccessful work attempt.

3. [Plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine, pain in the back, neck, shoulders, knees, and right leg and foot; depressive disorder.

[Plaintiff] has a history of chronic upper and low back pain with radioculopathy, down the right leg and associated with numbness and tingling in the right foot. She has been diagnosed with degenerative disc disease of the lumbar spine. An MRI scan of the lumbar spine in May 2005 showed mild to moderate degenerative changes at L5-S1. An MRI scan of the lumbar spine in March 2008 showed minimal L4-5 and L5-S1 degenerative changes with no stenosis or neural compression. An X-ray of the lumbar spine in June 2009 showed normal alignment and minimal degenerative changes.

[Plaintiff] has a history of pain in the neck and shoulders. An MRI of the cervical spine in 2003 showed disc osteophyte formation with effacement of the right hemicord at C5-6 with no evidence of stenosis.

10cv2385

[Plaintiff] has knee pain. She sustained a left knee meniscal tear and underwent a clincially successful repair. She has reported significant improvement in pain and that she had full range of motion of the knee joint.

The record establishes a depressive disorder NOS with anxiety features. While she has reported some anxiety or an agitated mood, exams show that she has been oriented in all spheres with a normal mood and affect.

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

I find that the [Plaintiff's] medically determinable impairments, alone or in combination, do not meet or medically equal any listing in Appendix 1, Subpart P, Regulations No. 4 and No. 16. No physician has opined that [Plaintiff's] condition meets or equals any listing and the state agency program physicians opined that it does not.

5. After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except for occasional bending, stooping, crouching, crawling, kneeling, balancing, and climbing stairs and ramps; no climbing ladders, ropes, or scaffolds; in light of her pain, she is limited to work with detailed but uncomplicated instructions that is performed up to moderate stress work environment.

In making this finding, the undersigned had considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

The [Plaintiff] has alleged disability due to back pain, neck pain, shoulder pain, arm pain, right leg pain, and bilateral leg and foot numbness.

After careful consideration of the evidence, the undersigned finds that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms: however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to extent they are inconsistent with the above residual functional capacity assessment.

10cv2385

While the [Plaintiff's] allegations of disability are inconsistent with her ability to care for others, she was able to care for her father who suffered from Alzheimer's disease and visited him at least every two days until he died in 2007. She has been able to care for her disabled mother who is wheel-chair bound and is dependent on oxygen therapy. She also cares for her son who is autistic.

The weight of the objective evidence does not support the claims of the [Plaintiff's] disabling limitations to the degree alleged. Physical exams do not support more restrictive than sedentary level work with postural restrictions. While progress notes show muscle spasms in the right side of her low back, straight leg raise testing has been negative. She has some diminished range of motion in the thoracic spine and lumbar spine. Despite her neck pain and upper extremity pain, she has a full range of motion of her neck and upper extremities. She has been neurologically intact. While it was noted in March 2006 that she had a right foot drop, she has satisfactory ability to heel and toe walk. Exams of her lower extremities show no significant crepitus or any instability, swelling, or warmth.

[Plaintiff] has not generally received the type of medical treatment one would expect for a totally disabled individual. Other than a left knee surgery for repair of a torn meniscus, the [Plaintiff's] course of treatment since her alleged disability onset date has generally reflected a conservative approach.

The record does not show that the [Plaintiff] requires any special accommodations (e.g., special breaks or positions) to relieve her pain or other symptoms.

In contrast to the allegations of the [Plaintiff's] disabling fatigue and weakness, she does not exhibit any significant atrophy, loss of strength, or difficulty moving that are indicative of severe and disabling pain.

Although the [Plaintiff] has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in her favor, the objective medical evidence shows that the medications have been relatively effective in controlling the [Plaintiff's] symptoms. Moreover, the [Plaintiff] has not alleged any side effects for the use of medications.

While the [Plaintiff] has had weight loss and complained of poor sleep due to chronic pain, there is not evidence of cognitive deficits due to pain or depression.

Consequently, the [Plaintiff's] allegations are not credible to establish a more restrictive residual functional capacity than that found above.

10cv2385

As for the opinion evidence, I have considered the opinion of Michael Sebahak (sic.), M.D., dated March 1, 2007, in which he stated that the [Plaintiff] was incapable of performing her regular and customary work from March 1, 2006 to March 1, 2008. I have given little weight to this opinion of disability. By regulation, opinions that the [Plaintiff] is "disabled" or "unable to work" are not entitled to any special significance, even when offered by a treating physician. [20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3)] and [Social Security Ruling 96-5p]. Dr Sebahak's (sic.)opinion failed to indicate any specific functional limits. His opinion is based on the [Plaintiff's] subjective claims and is not supported by objective findings indicating that the [Plaintiff] is more restricted than sedentary level work with postural restrictions.

I have considered the opinion of Linda Falconio, M.D., contained in an assessment dated June 15, 2009. Dr. Falconio filled out the pre-printed form and indicated that the [Plaintiff] was incapable of doing even low stress jobs; was limited to sitting for 15 minutes at a time and less than 2 hours total in an 8 hour workday; standing for 20 minutes at a time and for less than 2 hours total in an 8 hour workday; and expected that the [Plaintiff] would be absent from work more than 4 days per month. I give little weight to Dr. Falconio's opinion. As in the case of Dr. Ssebahak (sic.), Dr. Falconio's opinion is too extreme and not supported by the clinical findings or diagnostic studies documented by her and other treating sources.

I have considered the opinion of Angelina Hood, PhD., contained in an assessment dated June 22, 2009. Dr. Hood filled out the pre-printed form and opined that in every major mental functional domain, the [Plaintiff] had such extreme limits that she ranged between "unable to meet competitive standards" to "no useful ability to function." She further indicated that the [Plaintiff] had marked difficulties in the ability to maintain her activities of daily living, maintain social functioning, and maintain concentration, persistence, and pace. She also expected that the [Plaintiff] would be absent from work more than 4 days per month. I give little weight to Dr. Hood's opinion. Her opinion is too extreme. Indeed, it even conflicts with the [Plaintiff's] reported activities of daily living that show that she can do a wide range of activities even with her physical and mental difficulties. Indeed, she was able to care for her disabled father before his death in 2007 and continues to care for her disabled mother and autistic child. Dr. Hood's opinion concerning the [Plaintiff's] mental limits is not supported by the clinical findings documented by her as the [Plaintiff's] only mental health treating source.

There is no mental status exam or psychological testing. It appears that Dr. Hood has premised her opinion on the [Plaintiff's] subjective complaints.

On the other hand, I have given significant weight to the medical expert who had the opportunity to review the entire record. He took into consideration the [Plaintiff's] pain that reasonably flowed from her combined severe impairments.

In sum, the above residual functional capacity assessment is supported by the medical expert. The undersigned also took into consideration the [Plaintiff's] pain and mental symptoms in limiting her to work with detailed but uncomplicated tasks with exposure to no more than minimum stress levels.

6. [Plaintiff] is capable of performing past relevant work as a time share salesperson, telemarketer, and an airline sales agent. This work does not require the performance of work-related activities precluded by the [Plaintiff's] residual functional capacity.

I took testimony from the vocational expert regarding the classification of the [Plaintiff's] past work, and the ability of someone with the [Plaintiff's] residual functional capacity to perform the exertional and nonexertional requirements of such work, both as actually done and as generally done in the national economy.

I specifically asked the vocational expert to note and explain disagreements, if any, with the provisions of the Dictionary of Occupational Titles (DOT), and the vocational expert did not indicate any such disagreement.
After reviewing the documentary record and hearing the [Plaintiff's] detailed explanation of her past relevant work, the vocational expert classified that work as follows: telemarketer (DOT No. 299.357-014)(sedentary/semi-skilled); sales person, women's clothing (DOT No. 261.325-066)(light/semi skilled); sales person, jewelry (DOT No. 279.357-058)(light/skilled); airlines sales agent (DOT No. 238-367-018)(sedentary/sv-4); sales, time share (DOT No. 250.357-018)(light/skilled); and education consultant (DOT No. 099.167-014)(sedentary/skilled). The vocational expert further testified that the [Plaintiff] actually performed her past work in the same was as it is generally done in the national economy.

Hypothetically assuming the [Plaintiff's] residual functional capacity as found above, the vocational expert opined that the [Plaintiff] is able to perform her past relevant work as time share salesperson, telemarketer, and airline sales agent, both as actually done and as generally done in the national economy. I accept the testimony of the vocational

1

2

expert and so find. Since the [Plaintiff] can return
to past relevant work, she is not under a "disabil-
ity," as defined in the Social Security Act.

3

7. [Plaintiff] has not been under a disability, as
defined in the Social Security Act, from February 20,
2006, through the date of this decision. (citations to
exhibits omitted except where noted).

4

5

6

V

7

STANDARD OF REVIEW

8

   A district court may only disturb the Commissioner's final

9

decision "if it is based on legal error or if the fact findings are

10

not supported by substantial evidence." Sprague v. Bowen, 812 F. 2d

11

1226, 1229 (9th Cir. 1987); see Villa v. Heckler, 797 F.2d 794, 796

12

(9th Cir. 1986). The court cannot affirm the Commissioner's final

13

decision simply by isolating a certain amount of supporting

14

evidence. Rather, the court must examine the administrative record

15

as a whole. Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir.

16

1990). Yet, the Commissioner's findings are not subject to reversal

17

because substantial evidence exists in the record to support a

18

different conclusion. See, e.g., Mullen v. Brown, 800 F.2d 535, 545

19

(6th Cir. 1986). "Substantial evidence, considering the entire

20

record, is relevant evidence which a reasonable person might accept

21

as adequate to support a conclusion." Mathews v. Shalala, 10 F.3d

22

678, 679 (9th Cir. 1993); see Thompson v. Schweiker, 665 F.2d 936,

23

939 (9th Cir. 1982). The Commissioner's decision must be set aside,

24

even if supported by substantial evidence, if improper legal

25

standards were applied in reaching that decision. See, e.g., Benitez

26

v. Califano, 573 F.2d 653, 655 (9th Cir. 1978).

27

28

10cv2385

VI

<u>THE ALJ PROPERLY EVALUATED THE OPINIONS OF</u>

<u>PLAINTIFF'S TREATING PHYSICIANS</u>

Plaintiff argues that the ALJ incorrectly afforded controlling weight to the non-examining medical expert's opinions and that the ALJ should have afforded controlling weight to Plaintiff's treating physicians. Specifically, Plaintiff argues that controlling weight should have been given to the opinions of Dr. Angelina Hood, Dr. Linda Falconio, and Dr. Michael Sebahar (Plaintiff's psychologist, primary care physician, and pain management specialist, respectively).

Defendant argues that Plaintiff does not make a sufficient challenge because she fails to explain what error, or errors, the ALJ allegedly made, or how the evidence contradicts the ALJ's findings in any way.

"Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." <u>McLeod v. Astrue</u>, 640 F.3d 881, 884 (9th Cir. 2011), quoting <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-460 (9th Cir. 2001); see also <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). Furthermore, "[t]he ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989).

However, when the treating doctor's opinion is contradicted by another physician, including an examining physician or a non-examining physician, the Commissioner must provide 'specific and legitimate reasons' in the record for rejecting a treating physician's opinion, supported by substantial evidence. <u>Lester</u>, 81 F.3d at 830.

37

Specific and legitimate reasons are established when the ALJ "[sets] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Magallanes</u>, 881 F.2d at 751. The ALJ must not only offer his conclusions, but he also must "set forth his own interpretations and explain why they, rather than the doctors', are correct." <u>Orn v. Astrue</u>, 495 F.3d 625, 631 (9th Cir. 2007), quoting <u>Embrey v. Bowen</u>, 849 F.2d 418, 421–422 (9th Cir. 1988); See <u>Hutchens v. Astrue</u>, 2009 WL 1762570 at *2 (9th Cir. 2011)(the ALJ's observation that the opinions of the treating doctors were inconsistent with claimant's daily activities was a 'specific and legitimate' reason for giving them little weight); See <u>Edwards-Alexander v. Astrue</u>, 336 Fed.Appx. 634, 637 (9th Cir. 2009)(the ALJ *improperly* discounted the opinions of claimant's treating physicians by merely listing the inconsistencies between the doctors' assessments); See <u>McCoy v. Astrue</u>, 405 Fed.Appx. 222 at *1 (9th Cir. 2010)("[t]he ALJ's statements regarding the medical evidence as it related to the conflicting medical opinions provided a specific and legitimate explanation for rejecting the treating physician's conclusions.").

The ALJ may discount a treating physician's opinion if it is presented in the form of a check list and does not have supportive objective evidence, and is contradicted by other statements and assessments of claimant's medical condition. <u>Batson v. Comm. of Social Security</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

Since Plaintiff argues that the opinions of three of her primary treating physicians were contradicted by the opinions of both the state agency examining physician and the state agency reviewing physician, the 'specific and legitimate standard' applies here.

10cv2385

Plaintiff's relevant treating physicians include Doctors Angelina Hood, Linda Falconio, and Michael Sebahar. Drs. Falconio and Sebahar each completed Functional Capacity Questionnaires, and Dr. Hood completed a Mental Impairment Questionnaire on Plaintiff's behalf.

Plaintiff was examined by Dr. A.W. Lizarraras, a state agency medical consultant, and a Physical Residual Functional Capacity Assessment (hereafter "RFC") was completed on behalf of Plaintiff. (Tr. 469-474). Plaintiff was also examined by a state agency physician, Dr. H. Amado, and a Psychiatric Review Technique (hereafter "PST") was completed on behalf of Plaintiff. (Tr. 475-486).

Dr. Weilepp, a non-examining medical expert, and Mr. Kilcher, a vocational expert, testified as to Plaintiff's condition at her hearing with the ALJ. (Tr. 52-57).

1. <u>Dr. Angelina Hood</u>

The ALJ specifically addressed and legitimately discounted Dr. Hood's opinions. He provided multiple reasons for doing so; including (1) a lack of supporting objective evidence, (2) the inconsistencies between Plaintiff's admitted daily activities and her alleged restricted abilities, (3) the inconsistencies between Plaintiff's ability to care for her ailing parents, and her alleged restricted abilities, (4) Dr. Hood's report was merely a pre-printed questionnaire with no supporting objective tests, and (5) Dr. Hood's opinion seems to be premised on Plaintiff's subjective complaints. (Tr. 21).

The reasons provided by the ALJ are sufficient as substantial and legitimate reasons for discounting Dr. Hood's testimony. <u>Batson</u>, 359 F.3d at 1195.

10cv2385

2. <u>Drs. Falconio and Sebahar</u>

As to Dr. Falconio and Dr. Sebahar, the ALJ specifically addressed and legitimately discounted the doctors' opinions. The ALJ noted that both doctors' assertions are too severe and are not supported by the clinical findings or diagnostic studies documented by the other physicians. (Tr. 21).

In forming his own opinions, the ALJ relied heavily on the non-examining physician, Dr. Weilepp, who testified at Plaintiff's hearing. The ALJ described in detail the reasoning behind not giving controlling weight to the opinions of Plaintiff's treating physicians. The ALJ noted: (1) Plaintiff's ability to care for others, (2) the weight of the objective evidence in the record, including Plaintiff's physical exams, (3) Plaintiff's medical treatment, (4) the effectiveness of controlling Plaintiff's symptoms with medications, and (5) Plaintiff's own descriptions and testimony of her daily activities and capabilities. (Tr. 19-22). By setting forth a detailed summary of the facts and conflicting clinical evidence, and offering reasons for his conclusions, the ALJ provided adequate specific and legitimate reasons for rejecting the opinions of Plaintiff's treating physicians. <u>Magallanes</u>, 881 F.2d at 751; <u>Orn</u>, 495 F.3d at 631.

3. <u>Substantial Evidence Supports the ALJ's Finding</u>

Plaintiff argues that as a non-examining witness, Dr. Weilepp's opinions do not constitute 'substantial evidence' to support discounting or rejecting the opinions of her treating physicians.

'Substantial evidence' exists "when an examining physician provides independent clinical findings that differ from the findings of the treating physician." <u>Orn</u>, 495 F.3d at 631. "Independent clinical findings can be either a diagnosis different from that offered by another physician and supported by substantial evidence,

10cv2385

*or* findings based on objective tests that treating physicians have not considered." (quotations omitted). Id. at 631.

"The opinion of a nonexamining physician cannot *by itself* constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." Lester, 81 F. 3d at 831 (emphasis added); see also Orn, 495 F.3d at 632.

In this case, the ALJ based his rejection of the opinions of Plaintiff's treating physicians upon a review of the *entire* record, including objective testing evidence, Plaintiff's subjective complaints, reports from all treating physicians, and reports from examining physicians. The ALJ did not, as Plaintiff contends, rely solely on the opinion of Dr. Weilepp. The ALJ's Findings merely state that the ALJ gave *significant weight* to Dr. Weilepp's opinion and that Plaintiff's RFC Assessment is *supported* by Dr. Weilepp's findings. (Tr. 19-22). The ALJ based his rejection of Plaintiff's treating physicians on the entire record, which includes various reports from numerous doctors. Therefore, there is 'substantial evidence' to support the ALJ's rejection of the opinions of Plaintiff's treating physicians.

Since the ALJ had specific and legitimate reasons for discounting and rejecting the opinions of Plaintiff's treating physicians, and they were based on substantial evidence, the ALJ rightfully discounted and rejected the opinions of Plaintiff's treating physicians. The Court RECOMMENDS that Plaintiff's Motion for Summary Judgment in this regard be DENIED and that Defendant's Motion for Summary Judgment be GRANTED.

VII

<u>THE ALJ WAS NOT REQUIRED TO POSE A</u>

<u>HYPOTHETICAL QUESTION TO THE VOCATIONAL EXPERT</u>

Plaintiff argues that the ALJ failed to provide a complete hypothetical question to the vocational expert. Defendant responds that neither regulations nor case law required the ALJ to pose a hypothetical question to the vocational expert with regard to Plaintiff. Defendant is correct.

The Social Security Administration has a five step sequential process for determining whether a claimant has proved he or she is disabled. In steps one through four, the burden is on the claimant to demonstrate a severe impairment and an inability to perform past work. At the fourth step, the ALJ assesses a claimant's RFC and determines whether he or she can perform any past relevant work.  If the ALJ determines that the claimant is able to perform her past relevant work, then the claimant is not considered disabled for purposes of receiving disability benefits. See 20 C.F.R. § 404.1520.

If a claimant does show that she can not return to her previous job, the burden of proof shifts to the defendant to show that the claimant can do other kinds of work, [the "fifth step" of the sequential process]. If there is no reliable evidence of a claimant's ability to perform specific jobs, Defendant and/or the ALJ *must* use a vocational expert to provide the evidence. <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988).

However, when a claimant fails to show that he or she is unable to return to his or her previous job, the burden of proof remains with the claimant and the vocational expert's testimony is useful, but *not required*. <u>Mathews v. Shalala</u>, 10 F.3d 678, 681 (9th Cir. 1993), See also <u>Awad v. Astrue</u>, 2009 WL 2242356 at *7 (C.D.Cal. July 27, 2009).

10cv2385

1    In this case, the ALJ expressly found that as to step four of

2  the sequential evaluation, Plaintiff is capable of performing her

3  past relevant work and is not disabled. He subsequently omitted the

4  use of hypothetical questions to the vocational expert, but he still

5  consulted one. (Tr. 22, 57).

6         Although the vocational expert was not provided a

7  hypothetical question by the ALJ, he did rate each of Plaintiff's

8  past jobs according to the Dictionary of Occupational Titles

9  (hereafter "DOT"), and opined that Plaintiff's RFC is compatible

10  with her past work. The ALJ agreed. (Tr. 19, 22, 55-57). See 20

11  C.F.R. § 404.1560(b)(2);20 C.F.R. § 404.1520(f); Pinto v. Massanari,

12  249 F.3d 840, 845 (9th Cir. 2001)(holding that "the best source for

13  how a job is generally performed is usually the Dictionary of

14  Occupational Titles" and that the ALJ must find a relation between

15  claimant's RFC and past relevant work); Mondragon v. Astrue, 364

16  Fed.Appx. 346, 349 (9th Cir. 2010)(re-affirming the holding in

17  Pinto, 249 F.3d 840); see also Clark v. Astrue, 2011 WL 1792702

18  (E.D. Wash. May 10, 2011).

19     Plaintiff argues that she cannot perform her past relevant

20  work. Plaintiff primarily relies on an internet article found on

21  CareerBuilder.com,[50/] which discusses the alleged severe stress levels

22  associated with retail sales. This evidence is simply not enough to

23  meet Plaintiff's burden. A single internet article is insufficient

24  to suggest otherwise. The ALJ found that at work, Plaintiff is able

25  to engage in moderate stress levels. (Tr. 19). Plaintiff has not

26  provided sufficient evidence to suggest that she cannot.

---

[50/]    The article ranks the top eight "high stress jobs." According to the
author, retail sales is the number one most stressful job. The
article can be found at http://www.careerbuilder.com/Article/CB-
1005-Job-Search-Strategies-8-High-Stress-Jobs.

10cv2385

"The claimant establishes a prima facie case of disability by showing that a physical or mental impairment prevents him from performing his previous occupation. Martinex v. Heckler, 807 F.2d 771, 773 (9th Cir. 1986).

Other than briefly describing her impairments at her hearing with the ALJ, and stating in her brief that her previous jobs "involve high stress," Plaintiff has failed to prove or even to specifically address why she is unable to perform the duties of her previous occupations. To the contrary, Plaintiff did provide some evidence of her ability to engage in somewhat strenuous tasks, such as caring for sick family members, grocery shopping, and engaging in light cooking.

Since Plaintiff has failed to meet her burden of proof by showing that she is unable to return to her previous work, the ALJ did not err by neglecting to pose a hypothetical to the vocational expert. Furthermore, the ALJ correctly found that Plaintiff is capable of performing her past relevant work; specifically as a telemarketer and an airline sales agent. Further, Plaintiff's restrictions as determined by the ALJ are compatible with the requirements of these occupations, as defined in the DOT. (Tr. 19). See DOT code 299.357-014, DOT code 238.367-018. For the reasons stated, the Court RECOMMENDS Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

VIII

## THE ALJ PROVIDED A VALID BASIS FOR DISCREDITING PLAINTIFF

Plaintiff argues that the ALJ failed to offer clear and convincing reasons to reject Plaintiff's symptom testimony. Further, Plaintiff contends that it is improper for the ALJ to reject Plaintiff's subjective complaints of chronic pain and fatigue.

10cv2385

Defendant contends that the ALJ provided a valid basis for finding Plaintiff not fully credible as to her symptomology, and that the ALJ's reasons are supported by substantial evidence.

"In evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, the ALJ may not reject a claimant's subjective complaints based *solely* on a lack of *medical evidence* to fully corroborate the alleged severity of pain." Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005)(emphasis added).

When making such a credibility determination, the ALJ must engage in a two-step process:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain of other symptoms alleged...The claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only know that it could reasonably cause some degree of the symptom...If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives specific, clear and convincing reasons for the rejection.

Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009)(quotations and citations omitted); see also Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). "The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints-[g]eneral findings are insufficient." Burch, 400 F.3d at 680. (quotations omitted).

In an ALJ's credibility determination, the ALJ is permitted to consider various factors, including Plaintiff's daily living activities, objective medical findings, lack of consistent treatment, and lack of treatment or evaluation. Id. at 681; see also 20 C.F.R. § 404.1529.

10cv2385

In this case, Plaintiff complained, *inter alia*, of severe muscle cramping, numbness, limited standing and walking abilities, adverse side-effects from her medications, and moodiness from her chronic pain.

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause [her] alleged symptoms." (Tr. 20). This satisfied the first prong of the ALJ's inquiry regarding the credibility of Plaintiff's complaints. However, the ALJ refuted Plaintiff's credibility, stating, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 20). Since the ALJ did not allege any evidence that the Plaintiff may be malingering, he must provide clear and convincing evidence in support of his adverse credibility finding.

The ALJ made several specific findings in support of his conclusion that Plaintiff was not fully credible.

First, the ALJ found that Plaintiff's allegations of a disability were inconsistent with her ability to care for others. Plaintiff was able to care for her father who had Alzheimer's disease, Plaintiff was able to care for her mother who was wheel-chair bound, and Plaintiff was able to care for her autistic son. (Tr. 20). See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)(it is reasonable for the ALJ to conclude that a claimant is able to work if she is able to perform household chores and other activities); see also Morgan v. Apfel, 169 F.3d 595, 600 (9th Cir. 1999)(claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for a friend's child serves as evidence of a claimant's ability to work). This reason is valid to support the ALJ's adverse credibility finding.

10cv2385

Second, the ALJ found that the objective evidence in the record does not support Plaintiff's limitations to the degree asserted. The ALJ provides several objective medical findings to support this contention. (Tr. 20). See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)("although subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."). This reason is valid to support the ALJ's adverse credibility finding.

Third, the ALJ found that although the Plaintiff was prescribed, and took, appropriate medications for her alleged impairments, the objective evidence showed that the medications were effective, with few side-effects. See Warre v. Commissioner of Social Sec. Admin, 439 F.3d 1001, 1006 (9th Cir. 2006)("[i]mpairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits."). This reason is valid to support the ALJ's adverse credibility finding.

Fourth, the ALJ determined that Plaintiff has not received the type of medical care that one would ordinarily receive for her asserted limitations. The ALJ indicates that Plaintiff has undergone only a left knee surgery since her alleged onset date, reflecting a 'conservative treatment approach.' See Parra v. Astrue, 481 F.3d 742 (9th Cir. 2007)(noting that evidence of conservative treatment is sufficient to discount the severity of a claimant's disability claim.).

Plaintiff argues that her pain regimen consisted of more than merely 'conservative treatment.' Regardless, a resolution to this contention is irrelevant. Even if the ALJ erroneously classified

10cv2385

Plaintiff's treatment to be 'conservative,' this classification would consist of harmless error.

1. Harmless Error and Plaintiff's Credibility

"So long as there remains substantial evidence supporting the ALJ's conclusions on... credibility and the error does not negate the validity of the ALJ's ultimate [credibility] conclusion, such is deemed harmless and does not warrant reversal." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008)(quotations omitted); See also Batson, 359 F.3d at 1195-1197 (applying harmless error standard where one of the ALJ's several reasons supporting an adverse credibility finding was held invalid); Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1054-1055 (9th Cir. 2006)(harmless error applied where ALJ expressly discredited testimony but erred in doing so).

The ALJ provided various additional reasons supporting his credibility determination. This sole alleged error does not negate the ALJ's ultimate credibility finding. Therefore, his purportedly erroneous finding that Plaintiff's treatment was 'conservative,' was not erroneous, and even if deemed erroneous, was harmless error.

The ALJ provided sufficient, specific, clear, and convincing reasons for rejecting Plaintiff's subjective pain testimony. Therefore, he made an appropriate credibility determination as to Plaintiff.

2. Harmless Error and Third Party Lay-Witness Testimony

Plaintiff further argues that the ALJ erred when he failed to mention the statement of Plaintiff's son, Aaron Aufderheide. (Tr. 155-162). Plaintiff alleges that Mr. Aufderheide's statements supported her subjective complaints, and a failure to assess his statements resulted in harmful error.

10cv2385

The burden is on the Plaintiff to show how the alleged error caused harm. Shinseki v. Sanders, 556 U.S. 396 (2009); McLeod v. Astrue, 640 F.3d 881 (9th Cir. 2011)(the Ninth Circuit applies the Sanders harmless error rule to social security cases).

The ALJ is required to consider observations by non-medical sources about how impairments affect a claimant's ability to work "where a claimant alleges pain or other symptoms that are not supported by medical evidence in the file." Smolen v. Chater, 80 F.3d 1273, 1288 (1996)(quotations omitted).

"When an ALJ discounts the testimony of lay witnesses, he must give reasons that are germane to each witness." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009), quoting Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). Should an ALJ neglect to address lay witness testimony, "a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony [of a lay witness], could have reached a different disability determination." Stout, 454 F.3d at 1056.

When a third party report is largely duplicative of Plaintiff's own testimony, an ALJ is not said to have "rejected" the report simply because it fails to discuss the third party report in its decision, and the error is harmless. Zerba v. Comm'r Soc. Sec. Admin., 279 Fed. Appx. 438, 440 (9th Cir. 2008); Lopez v. Astrue, 2011 WL 379321 at *15 (D. AZ. 2011); see also Smith v. Astrue, 2010 WL 4530154 at *11 (E.D. Cal. 2010); Noziska v. Astrue, 2010 WL 3123257 at *9 (D. MT. 2010).

As a preliminary matter, Mr. Aufderheide's report was not testimony and was not signed under penalty of perjury. Therefore, the standards applicable to testimony do not apply to his statement. Smith, supra, at *11.

10cv2385

Further, Mr. Aufderheide's report is largely duplicative of the subjective complaints provided by Plaintiff herself. Since the ALJ properly evaluated Plaintiff's subjective complaints, and Mr. Aufderheide's report reiterates the same complaints, any error by the ALJ in failing to specifically reject Mr, Aufderheide's report was harmless error. <u>Smith</u>, <u>supra</u>, at *11 [citing <u>Curry v. Sullivan</u>, 925 F.2d 1127 (9th Cir. 2001)]; <u>Noziska</u>, 2010 WL 3123257 at *9. Had Mr. Aufderheide's report been evaluated by the ALJ, the ALJ's determination as to Plaintiff's lack of disability would have been unchanged. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 885 (9th Cir. 2006).

Therefore, the ALJ appropriately evaluated Plaintiff's subjective testimony and any error that he made with regard to Plaintiff's credibility or lay witness information was harmless.

For the aforementioned reasons, the Court RECOMMENDS Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

IX

<u>CONCLUSION AND RECOMMENDATION</u>

After a review of the record in this matter, the undersigned Magistrate Judge RECOMMENDS that the Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than <u>August 31, 2011</u>,any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

10cv2385

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be

2    filed with the Court and served on all parties no later than

3    September 14, 2011. The parties are advised that failure to file

4    objections within the specified time may waive the right to raise

5    those objections on appeal of the Court's order. Martinez v. Ylst,

6    951 F.2d 1153 (9th Cir. 1991).

7

8    DATED:  August 3, 2011

9

10

11    _____
      Hon. William V. Gallo
12    U.S. Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10cv2385